**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT WINCHESTER**

| | | | |
|---|---|---|---|
| DENNIS WOODARD, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | No.: | 4:16-CV-102-DCLC-CHS |
| | ) | | |
| MARTIN FRINK[1], | ) | | |
| | ) | | |
| Respondent. | ) | | |

**MEMORANDUM OPINION**

Petitioner Dennis Woodard, a prisoner of the Tennessee Department of Correction, has

filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the constitutionality

of his confinement pursuant to a Bedford County conviction for first-degree premeditated murder

[Doc. 1], as well as two subsequent amended petitions [Doc. 11 and 20].  Having considered the

submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the

Court finds that Petitioner is not entitled to relief under §2254 and no evidentiary hearing is

warranted.  *See* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465,

474 (2007).  For the reasons set forth below, the §2254 petition will be **DENIED** and this matter

will be **DISMISSED**.

## I.    BACKGROUND

On June 18, 2001, a Bedford County Grand Jury indicted Petitioner for one count of first-

degree premeditated murder for the April 13, 2001 shooting of Scott Shafer [Doc. 16-1 p. 4].  Upon

Direct Appeal, the Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence

---

[1] Respondent formerly presented Rusty Washburn as the proper Respondent.  However,
the Court takes judicial notice that Petitioner is currently confined at Trousdale Turner
Correctional Center, where Martin Frink is the warden.  As such, Warden Frink should be
substituted as the proper respondent in this case.  *See* Habeas Rule 2.

against Petitioner as follows:

> The proof offered by the State demonstrated that on the night of April 13, 2001, the homicide victim, Scott Shafer, was shot near Derry Street in Shelbyville. Earlier that day, at around four o'clock, the victim had been visiting the home of LaShawn Nunnally. Ms. Nunnally testified that sometime later the Defendant arrived at her house carrying a gun. The Defendant pointed the gun at the victim and said, "Nigga, are you real or are you fake?" The victim responded to the Defendant, who was commonly referred to as "Junior," by saying, "Junior, man, quit playing. I'm fucked up." The Defendant, still pointing the gun at the victim, then repeated his question. At that point, Ms. Nunnally requested that the two men leave the front of her house. The Defendant and the victim went to the rear of the house, and Ms. Nunnally followed. She asked the Defendant for the gun, and he gave it to her. Immediately thereafter, Jarmaine Hill, Ms. Nunnally's boyfriend, and Mike Jones arrived. Mr. Hill inquired what Ms. Nunnally was doing with the Defendant's gun. She responded that she was trying to "prevent trouble." Mr. Hill then demanded that she return the Defendant's gun, which she did, but she kept the clip that contained the bullets and went back around to the front porch of her house. A few minutes later, the four men came to the front of the house, and the Defendant's mouth was bleeding. When Ms. Nunnally asked what had happened, the victim replied, "I dunked him on his head." The Defendant then said to the victim, "Man, you fucked up my grill." Then the Defendant smiled at the victim and added, "You are going to remember this tonight." However, Ms. Nunnally testified that the Defendant and the victim then hugged, made up, and left together in the victim's car. After all the men left, Ms. Nunnally wrapped the pistol clip in toilet paper and tossed it into a creek.

> About two hours later, Ms. Nunnally had gone to another house to visit with friends. Jarmaine Hill and Mike Jones arrived; then a few minutes later, the Defendant and the victim drove up. As the day got later, Ms. Nunnally, her two daughters, and the victim decided to walk back to Ms. Nunnally's house to get their jackets. As they returned from getting their coats, the Defendant walked up, pointed the gun at the victim, and said, "Nigga, are you ready to die?" The Defendant then shot the victim, who fell down. He pulled the trigger several more times, but the gun would not fire because the clip had been removed. The Defendant, who then ran away, was wearing a yellow shirt, black denim shorts, black Nike shoes, and black socks. Ms. Nunnally ran to a pay telephone and called 911. She then located the victim, who had run a short distance and fallen down, and she applied a blanket to his wound.

2

On cross-examination, Ms. Nunnally said that the Defendant appeared intoxicated while he was at her house. She said that his speech was slurred and he was staggering. He also appeared to be intoxicated when she left her friend's house to get the jackets from her house. She said that when the police arrived, she was beside the victim, rendering aid.

Thomas Thompson testified that on the evening of April 13, 2001, he was in his house at 101 Byrd Street. At around 7:40 that night, he heard what sounded like a gunshot. He then looked out his window and saw a white man run between 714 and 716 Derry Street, fall down on the ground, and yell that he had been shot. Then Mr. Thompson looked behind Smith's Food Town on Derry Street and saw a black man in a yellow shirt run behind the store.

James Wheeler testified that at around nine o'clock on the night of April 13, 2001, a young black man, whom he identified as the Defendant, knocked on his door. Mr. Wheeler testified that the Defendant was bleeding from his mouth, and he initially thought that the Defendant had been in a car accident. However, the Defendant said that he had been beaten up, and he asked to use the telephone. While Mr. Wheeler was inside his house retrieving a cordless phone for the Defendant, he decided to call 911 to have an ambulance come render aid to the Defendant. When Mr. Wheeler went outside to give the Defendant the telephone, he observed a car drive up with a young man and woman inside. Mr. Wheeler recognized the driver of the car as a man named Matt Kelly. The Defendant, who Mr. Wheeler said was "fidgety" and "obviously wanting to leave," got in the car with Mr. Kelly and drove away. On cross-examination, Mr. Wheeler testified that the Defendant was having difficulty breathing and speaking because of the condition of his mouth.

David Williams, an officer with the Bedford County Sheriff's Department, testified that he accompanied the ambulance to Mr. Wheeler's residence in response to Mr. Wheeler's 911 call. As he was driving, he passed a white Honda Accord. Upon speaking with Mr. Wheeler, he learned that the subject had left in that car. Officer Williams then followed the Accord to the emergency room parking lot, where he stopped the vehicle. The Defendant was in the back seat, and Officer Williams noticed that he had injuries to his face, he had blood down the front of his body, and he was not wearing a shirt. When the officer asked for his name, the Defendant replied that his name was Simms.

3

However, the driver of the car, Matt Kelly, told the Defendant to tell the truth, and the Defendant then told the officer that his name was Junior Woodard. Officer Williams asked another officer, D'Angelo Inman of the Tennessee Highway Patrol, to pat down the Defendant for weapons. Officer Inman located a Taurus .40 caliber semi-automatic pistol in the Defendant's pocket. The weapon had no clip in the grip. Officer Williams then placed the Defendant in his patrol car and called for the city police. Officer Williams testified that he smelled alcohol on the Defendant, but that the Defendant was coherent and had no trouble walking. Officer Inman, on the other hand, testified that he did not notice an odor of alcohol about the Defendant.

Back at the scene of the shooting, Rod Stacey was the patrolman with the Shelbyville Police Department who first arrived. He testified that he located a white male, whom he recognized as the victim, Scott Shafer, lying on the ground in between 714 and 716 Derry Street. Officer Stacey observed an entrance wound and an exit wound in the victim's left arm and an entrance wound in the victim's abdomen. Officer Stacey testified that the victim did not tell him who shot him or the circumstances surrounding the shooting.

Detective Eric Ely of the Shelbyville Police Department arrived on the scene after other officers had already secured the area and begun searching for evidence. He was directed to an area where David Williams of the Bedford County Sheriff's Department had located a shell casing earlier that evening. Detective Ely photographed the cartridge and took it into evidence. He testified that it was the casing of a .40 caliber bullet. At around 10:25 that evening, Detective Ely went to the hospital where other officers had the Defendant in custody. There he received the Taurus pistol that Trooper Inman had found in the Defendant's pocket. Detective Ely stated that he read the Defendant his rights. Noticing that the Defendant had blood on his lip and some of his teeth were dislodged, he asked him, "What happened to your mouth?" The Defendant replied, "I didn't shoot anybody." The detective testified that he did not smell alcohol on the Defendant during this conversation. Later in his investigation, Detective Ely went to the office of the state medical examiner, where he received the bullet that had been removed from the body of the victim.

Teri Arney is a forensic scientist with the Tennessee Bureau of Investigation. She examined the shell casing found at the scene of the shooting, the bullet extracted from the victim's body, and the handgun found in the Defendant's pocket. She testified that the gun

4

was a Taurus model PT140 .40 caliber semi-automatic pistol. She determined that the bullet and shell casing had been fired and ejected from the Defendant's gun.

Jeff Long is the EMT worker who administered medical aid to the victim. Mr. Long testified that when he encountered the victim, he was pale and sweating. The victim's lack of color indicated blood loss, and the perspiration indicated that he was beginning to go into shock. These signs suggested that the victim was bleeding internally and needed to be flown via helicopter to Nashville for surgery.

Jeffery Guy is a surgeon at Vanderbilt Hospital who treated the victim. He testified that the victim had extremely low blood pressure when he arrived at Vanderbilt. Despite the efforts of the surgical team, Scott Shafer died from blood loss as a result of gunshot wounds to the spleen, pancreas, and intestines.

Feng Li of the state medical examiner's office performed an autopsy on the victim's body on April 14, 2001. He testified that the victim died of gunshot wounds to different internal organs, and that all of the wounds had been caused by a single bullet. He also testified that no alcohol or drugs were detected in the victim's blood.

Rhonda Hill testified that her son Chris received a letter in May of 2001. She recognized the return address on the envelope as being the Bedford County Jail; so she decided to read the letter. The letter was dated May 23, 2001, the day after the Defendant's preliminary hearing. The letter was from the Defendant, who referred to himself as "Juvy." In the letter, the Defendant stated that a girl named Shawn is "running her mouth." The Defendant's letter asked Chris to prevent Ms. Nunnally from making the June 18 court date, which is the date on which the Defendant's case was presented to the grand jury. Finally, the Defendant requested Chris to "hook up with Mickey and burn this bitch house down." After reading the letter, Ms. Hill went to the police station and gave the police the letter. Henry Young, who was in jail with the Defendant, testified that he observed the Defendant writing the letter. Mr. Young testified that after his preliminary hearing on May 22, 2001, the Defendant mentioned LaShawn Nunnally's testimony and that it "needed to be taken care of."

After the State rested its case, the Defendant testified on his own behalf. He stated that, on the afternoon of April 13, 2001, he had been out riding with the victim, Scott Shafer. The Defendant had drunk three quarts of Budweiser beer in thirty minutes when he first joined the victim. After the Defendant left the victim's car,

the Defendant decided to walk to LaShawn Nunnally's house. When he arrived, the victim was already there. The two men exchanged words regarding whether the victim had tried to "holler" at the Defendant's girlfriend. At this point, the Defendant testified that his gun was in his pocket. He handed the gun to Ms. Nunnally, and the argument between the Defendant and the victim escalated into a fight. The victim punched the Defendant in the mouth, and the two wrestled on the ground. During the fight, the Defendant suffered a busted lip and lost a tooth. After the fight, the two men apologized to each other, hugged, and left in the victim's car. The Defendant stated that when they left, Ms. Nunnally still had the gun.

The Defendant and the victim then went to a store, where the Defendant bought another quart of beer. After riding around for awhile, the two men returned to Ms. Nunnally's house. When they arrived, Ms. Nunnally and Mike Jones were there. The group was sitting on the front porch talking, when Jarmaine Hill showed up.

Mr. Hill and Ms. Nunnally went inside the house for fifteen to thirty minutes. When Mr. Hill came back onto the front porch, he told the Defendant that he wanted to speak with him. The two men walked down the street and talked. The Defendant testified that when they returned, he sat back down on Ms. Nunnally's front porch. Then the Defendant looked up and observed Mr. Hill pointing a gun at the victim. The Defendant stated that Mr. Hill shot the victim. Mr. Hill ran away, but the Defendant remained on the porch. At that time, Ms. Nunnally approached the Defendant, said "Here," and handed him the pistol. The Defendant took the gun and ran. The Defendant said that he ran past Smith's Food Town, and he stopped and knocked on the door of James Wheeler because he did not know how to get to his friend Matt Kelly's house. While he was at Mr. Wheeler's house, Matt Kelly drove up, and the Defendant got in his car. The Defendant testified that they drove to the hospital because he was concerned about the victim. Later on in his testimony, the Defendant admitted writing the letter to Chris Hodge asking him to burn down the house of LaShawn Nunnally "to make her stop lying on [him]."

The defense called Jarmaine Hill as a witness, but he asserted his Fifth Amendment privilege against self-incrimination. Therefore, the trial court declared Mr. Hill unavailable, and the defense called Randall Lottie. Mr. Lottie testified that, while he was incarcerated with Mr. Hill, he heard Mr. Hill say that he killed Scott Shafer. Mr. Hill said that Mr. Shafer owed him money for drugs, and that another person was in jail for his crime.

6

*State v. Woodard*, No. M2002-00122-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 52, at *1–13 (Tenn. Crim. App. Jan. 24, 2003) ("*Woodard I*"), (footnotes omitted), *perm. app. denied* (Tenn. May 12, 2003).

On October 11, 2001, a Bedford County jury found Petitioner guilty of murder in the first degree, resulting in a life sentence [Doc. 16-2 p. 20, 25]. Petitioner appealed, raising only a singular claim that the evidence was insufficient to support his conviction [Doc. 16-7]. The Tennessee Court of Criminal Appeals ("TCCA") affirmed the judgment of the trial court. *Id.* at *18. The Tennessee Supreme Court ("TSC") denied Petitioner permission to appeal on May 12, 2003. *State v. Woodard*, M2002-00122-SC-R11-CD, 2003, Tenn. LEXIS 427, at *1 (Tenn. May 12, 2003).

Nearly two years later, on April 22, 2005, Petitioner filed a pro se post-conviction petition alleging the ineffective assistance of his trial counsel, which he argued should be treated as timely because counsel did not alert him to, nor did he otherwise learn of, the TSC's denial of his application for permission to appeal until after the statute of limitations had expired [Doc. 16-23 p. 14–16]. The post-conviction court dismissed the petition as untimely on August 30, 2005, finding that Petitioner's circumstances did not warrant tolling of the statute of limitations [*Id.* at 50–54]. Petitioner did not appeal.

More than seven years later, on May 10, 2013, Petitioner filed a second petition which set forth claims for both post-conviction and writ of error coram nobis relief [Doc.16-14, p. 4–50]. Here, Petitioner conceded that the petition was untimely but argued, *inter alia*, that he should be entitled to tolling of the statute of limitations as he had recently uncovered evidence of his counsel's "deliberate deception" in having an active conflict of interest at the time of Petitioner's trial and concealing that conflict [*Id.* at 13]. Specifically, Petitioner alleged that he had learned

7

that counsel, without Petitioner's knowledge, had advised a State witness, who was counsel's former client, to testify against Petitioner [*Id.*]. Petitioner included sworn affidavits from himself and Henry Young, indicating that counsel told Mr. Young that the prosecution "would take it lightly on [him] at sentencing" for testifying at Petitioner's trial [*Id.*]. He likewise included portions of the trial transcript which evidenced that counsel represented Mr. Young. While the post-conviction court dismissed this petition as untimely [*Id.* at 105–06], the TCCA reversed finding that due process warranted equitable tolling of the statute of limitations as Petitioner had been diligently pursuing his rights and remanded the petition for an evidentiary hearing. *Woodard v. State*, No. M2013-01857-CCA-R3-PC, 2014 Tenn. Crim. App. LEXIS 887, at *1 (Tenn. Crim. App. Sept. 15, 2014) ("*Woodard II*").

At the evidentiary hearing, trial counsel conceded that he had formerly represented Mr. Young, who had been a "long-time client" of the public defender's office, but stated that he did not represent Petitioner and Mr. Young simultaneously. *Woodard v. State*, No. M2015-02002-CCA-R3-ECN, 2016 Tenn. Crim. App. LEXIS 847, at *17–19 (Tenn. Crim. App. Nov. 8, 2016) ("*Woodard III*"). Counsel claimed that at the time Mr. Young was placed on the State's witness list, the public defender's office had ended its representation of Mr. Young pursuant to his guilty plea. *Id.* The TCCA summarized the evidence adduced at the evidentiary hearing as follows:

> At the evidentiary hearing, trial counsel testified that he had practiced law for twenty-five years and that he had been an assistant public defender for sixteen years. Counsel said that he had worked in the public defender's office for two years at the time he represented the Petitioner. Counsel said that he investigated the Petitioner's case by interviewing witnesses, talking to the Petitioner, following up on discovery, and reviewing the autopsy and laboratory reports. He said he interviewed the police officers involved, although he did not have any records relative to their conversations. He said the physicians were interviewed before the trial, although he could not recall whether he or the investigator interviewed them.

8

Trial counsel testified that he previously represented Brooke Whitaker but not when he represented the Petitioner. Counsel said that relative to the Petitioner's case, he first heard Ms. Whitaker's name when he read the post-conviction petition. Counsel was unsure whether he knew the offense occurred near Ms. Whitaker's home and said that he did not know where she lived at the time of the offense and that nobody mentioned Ms. Whitaker's name in connection with the Petitioner's case.

Trial counsel testified that the Petitioner claimed he was innocent and that counsel determined a mental health expert was unnecessary relative to the Petitioner's intent at the time of the offense. Counsel knew about the Petitioner's juvenile psychiatric records and said that had an expert testified, the jury would have heard evidence the Petitioner had been previously diagnosed with "intermittent explosive disorder," which counsel described as "flying off the handle" and committing violent acts. Counsel said that he recalled the Petitioner had been previously evaluated for mental health reasons but did not recall the Petitioner's being hospitalized in a mental health facility. Counsel recalled the Petitioner's diagnosis was depression caused by legal difficulties. Counsel said that based upon the diagnosis, requesting an expert was pointless. Counsel was unsure whether the trial court would have granted a request for expert funding.

Trial counsel testified that he did not obtain an expert to testify about the Petitioner's intoxication because the evidence showed the Petitioner had been drinking on the day of the offense. Counsel said that after reviewing the records and the witness statements and speaking with the Petitioner, counsel determined an intoxication expert was unnecessary.

Trial counsel testified that he was familiar with Henry Young, that he had represented Mr. Young, and that Mr. Young had been a long-time client of the public defender's office. Counsel denied, though, that he represented the Petitioner and Mr. Young simultaneously. Counsel said that the public defender's office represented Mr. Young before the homicide in the Petitioner's case, that Mr. Young pleaded guilty, and that Mr. Young, ultimately violated the conditions of his community corrections sentence. Counsel said that at some point, Mr. Young incurred additional charges, that the public defender's office represented Mr. Young, that Mr. Young pleaded guilty, and that this charge occurred when the Petitioner's case was pending. Counsel said that after Mr. Young pleaded guilty in the subsequent case, counsel received the State's supplemental

9

witness list in the Petitioner's case, which included Mr. Young. Counsel said that at that point, the public defender's office had ended its representation of Mr. Young.

Trial counsel testified that the Petitioner reported counsel to the Board of Professional Responsibility, alleging that counsel represented the Petitioner and Mr. Young simultaneously and that counsel advised Mr. Young to testify against the Petitioner. Counsel denied the allegations and said that the Board of Professional Responsibility opened an investigation and, ultimately, dismissed the complaint. Counsel admitted he represented Mr. Young while the Petitioner's case was pending but said he did not represent Mr. Young at the time of the Petitioner's trial. Counsel agreed he represented the Petitioner when counsel represented Mr. Young at an August 2, 2001 guilty plea hearing but said that he and the public defender's office had no information or knowledge that Mr. Young was involved with or connected to the Petitioner's case. Counsel agreed the supplemental witness list relative to the Petitioner's case was received on October 5, 2001. Counsel said he did not file a motion to withdraw as the Petitioner's counsel because neither counsel nor the public defender's office represented Mr. Young when counsel learned Mr. Young was a State's witness at the Petitioner's trial. Counsel said he probably considered whether a motion to withdraw was necessary but said his office no longer represented Mr. Young. Counsel recalled that he received the supplemental witness list sixty days after his office ended its representation of Mr. Young and that no conflict of interests existed at that point. Counsel said that the Petitioner knew counsel represented Mr. Young because the Petitioner mentioned it to counsel.

Trial counsel testified that Mr. Young's testifying at the Petitioner's trial was not "as big a deal" as the woman who testified that she saw the Petitioner shoot the victim and that the woman was identified as a State's witness in the initial witness list. He said that although Mr. Young was not his client when counsel received the supplemental witness list, counsel spoke to Mr. Young, who said that he saw the Petitioner write a letter while Mr. Young and the Petitioner were confined in the jail. Counsel said co-counsel cross-examined Mr. Young at the trial. Counsel said that his office did not work on the Petitioner's appeal and that a private attorney was appointed for the appeal.

Trial counsel testified that the State obtained permission from the trial court to introduce a letter written by the Petitioner in which the Petitioner attempted to solicit the killing of Ms. Nunnally and that

the defense did not object to the letter because the Petitioner admitted writing it. Counsel said that he received a notice of intent to introduce the letter and that a pretrial hearing was probably held, although he had no recollection of it. He agreed the transcript reflected that the parties discussed Mr. Young's testifying relative to the letter and that counsel told the trial court the defense had interviewed Mr. Young before the trial. Counsel said he told the trial court that he would object on the basis of relevance to questions about who represented Mr. Young when Mr. Young obtained his convictions. Counsel said the Petitioner was told that Mr. Young saw the Petitioner write the letter and would testify against the Petitioner. Counsel said that he last represented Mr. Young at a guilty plea hearing on August 2, 2001, and that during the plea negotiations, no discussion occurred about Mr. Young's receiving any benefit for testifying against the Petitioner.

Trial counsel testified that although he did not maintain records about how much time he spent on trial preparation, he estimated he spent at least forty hours preparing for the Petitioner's trial. Counsel said that he and the Petitioner discussed the possibility of an intoxication defense in conjunction with the Petitioner's mental health issues, although counsel did not specifically recall the conversation. Counsel initially believed the State extended a plea offer for second degree murder but said after reviewing his file and speaking to the prosecutor, that no offer was made to the Petitioner. Counsel recalled attempting to solicit an offer and focusing on the Petitioner's youth and psychiatric problems as a basis for a guilty plea to a lesser included offense. Counsel said that the State believed it had adequate proof for a first degree murder conviction and that the Petitioner's only options were to plead guilty to first degree murder or to go to trial. Counsel said he spoke to the prosecutor and did not write correspondence during negotiations. Counsel agreed that his goal was to negotiate a plea agreement for anything less than first degree murder but that the prosecution was unwilling to negotiate.

Trial counsel testified that he did not know when the defense received the letter the Petitioner wrote while in jail. Counsel did not recall what questions were asked of Mr. Young during co-counsel's cross-examination. Counsel was familiar with the name Jermaine Hill, although counsel did not know Mr. Hill personally. Counsel did not recall whether Mr. Hill was the person the defense identified as the perpetrator.

On cross-examination, trial counsel testified that before the Petitioner's trial, counsel did not know Ms. Whitaker but that

counsel represented Ms. Whitaker multiple times after the Petitioner's trial. Counsel said that the Petitioner never mentioned Ms. Whitaker. Counsel agreed that the trial evidence showed that the Petitioner drank several "quarts" of beer on the day of the shooting and that the jury knew of the Petitioner's intoxication. Counsel said he did not want the jury to hear evidence of the Petitioner's intermittent explosive disorder diagnosis because counsel knew the trial evidence would show the Petitioner and the victim had an altercation hours before the shooting.

Trial counsel testified that he learned of Mr. Young's involvement in the Petitioner's case when the State filed its supplemental witness list and that generally, the State provided the defense with information about additional witnesses and how the witness related to a case. Counsel said that even if he had learned confidential information during his representation of Mr. Young, any confidential information during his representation of Mr. Young, any confidential information learned would not have been to the Petitioner's detriment. Counsel agreed his and the public defender's office's practices were to contact the Board of Professional Responsibility to determine whether a conflict might prevent counsel or his office from representing a defendant. Counsel agreed that no discussions were held with Mr. Young about the Petitioner's case until the State filed its supplemental witness list. Counsel said the trial judge was told about counsel's previously representing Mr. Young.

Trial counsel testified that the letter written by the Petitioner while in jail was discovered by the State after the preliminary hearing and that the letter was postmarked May 24, two days after the preliminary hearing. Counsel said the Petitioner admitted writing the letter to Chris Hodge and requesting that Mr. Hodge kill Ms. Nunnally by burning her home. Counsel agreed that the extent of Mr. Young's trial testimony was that Mr. Young witnesses the Petitioner write the letter and that the Petitioner asked Mr. Young for assistance spelling a couple of words.

Trial counsel testified that had he sought to admit the Petitioner's mental health records, the jury would have heard evidence of the Petitioner's owning a firearm and firing the gun during a struggle with his father. Counsel agreed the evaluating psychiatrist would have been subject to cross-examination. Counsel said he was concerned about the psychiatrist's testifying about the Petitioner's disruptive, aggressive, and violent behaviors and about the psychiatrist's conclusion that the Petitioner did not have any mental health illness requiring inpatient treatment.

12

On redirect examination, trial counsel testified that he did not know Dana Brown and that he did not recall the name associated with the return address on the envelope of the Petitioner's letter to Mr. Hodge.

Upon questioning by the post-conviction court, trial counsel testified that Mr. Young did not disclose any impeachable conduct or prior bad acts during counsel's representation of Mr. Young. Relative to the Petitioner's letter, counsel said the Petitioner admitted writing the letter to counsel privately, and counsel thought the Petitioner was questioned about the letter at the trial.

Co-counsel testified that he had been a licensed attorney since 1999 and that his career had been devoted to criminal defense work. He recalled working on the preliminary hearing in the Petitioner's case but said trial counsel was the primary attorney. Co-counsel said that at the time of the Petitioner's case, co-counsel was relatively inexperienced, handled general sessions court, and assisted trial counsel in criminal court. Co-counsel recalled the Petitioner insisted on attempting to obtain a not guilty verdict and did not want to pursue an intoxication defense.

Co-counsel testified that Mr. Young was a witness for the State and that although the public defender's office represented Mr. Young before the Petitioner's case, the public defender's office did not represent the Petitioner and Mr. Young simultaneously. Co-counsel said that a conflict of interests existed if the public defender's office represented a defendant and a State's witness simultaneously. Co-counsel said that he cross-examined Mr. Young at the trial and that co-counsel asked Mr. Young if the Petitioner told him that Ms. Nunnally was lying and whether Mr. Young read the Petitioner's letter. Co-counsel agreed he did not ask Mr. Young about his burglary-related convictions and said the evidence about Mr. Young's previous convictions was elicited by the prosecutor on direct examination. Co-counsel said he cross-examined Mr. Young in an effort to gain experience, not because trial counsel might have had a conflict of interests.

Henry Young testified that the Petitioner was a friend and that they were confined at the same jail. Mr. Young said that just before the Petitioner's trial, trial counsel came to the jail to talk to Mr. Young. Mr. Young said that counsel had represented him a few times. He said that at the time of the Petitioner's trial, he had a previous conviction for burglary and that counsel was his attorney. He said he received a two-year sentence, served one year in jail before being

released, and returned to jail after being arrested for driving with a suspended license. He said that after his release was revoked, counsel came to the jail to talk to him. Mr. Young considered counsel his attorney at that time and said counsel asked what Mr. Young knew about the Petitioner's case. Mr. Young said he told counsel, "Nothing." Mr. Young said he told counsel that Mr. Young frequently assisted the Petitioner with writing letters. Mr. Young said he and counsel spoke about other topics, but he could not recall what they discussed. Mr. Young said that he did not know counsel represented the Petitioner at the time of their conversation. Mr. Young did not recall talking to the police or to the prosecutor about the Petitioner's letter.

On cross-examination, Mr. Young testified that he received a community corrections sentence upon being convicted of burglary in 1999, that he served one year in jail before being released to community corrections, that he violated the terms of his release, and that he was ordered to serve his sentence, which was enhanced to three years. Mr. Young said trial counsel represented him for the burglary charge and the community corrections violation. Mr. Young stated that he pleaded guilty to two counts of aggravated burglary on August 2, 2001, that he received an effective four-year sentence, and that counsel was his attorney. Mr. Young denied telling counsel that he committed crimes for which he was not charged while counsel represented him.

Mr. Young testified that trial counsel came to speak with him about the Petitioner's case, that counsel discussed the prosecutor's adding Mr. Young's name to the witness list relative to the Petitioner's trial, that counsel said the reason was based upon a letter, and that counsel asked what he knew about the letter. Mr. Young said that he did not regard the conversation as important or confidential at the time. Mr. Young agreed that the aggravated burglary cases had been resolved by plea agreement at the time counsel came to talk to him about the Petitioner's case but that he was unsure whether he had been sentenced. Mr. Young agreed the aggravated burglary judgments were entered on August 2, 2001, and that his case had ended when the Petitioner's trial began in October 2001. Mr. Young agreed that he did not return to court after he pleaded guilty to aggravated burglary. Mr. Young stated that at the time of the post-conviction hearing, he was on probation and that counsel was not his attorney for this matter.

The Petitioner testified that trial counsel and co-counsel visited him at the jail three times before the trial. The Petitioner said that as a juvenile, he used drugs, had a history with the police, and had

obtained mental health counseling and treatment at two hospitals. The Petitioner agreed that he had been drinking on the night of the shooting and said that no physicians evaluated him before the trial. He agreed he testified at the trial and said had he known trial counsel had represented Mr. Young, the Petitioner would not have testified. The Petitioner said information related to counsel's representing Mr. Young was "kept from" him. He said he learned counsel had previously represented Mr. Young about two years before the post-conviction hearing.

The Petitioner testified that he told trial counsel and co-counsel that he was not guilty but that the Petitioner did not discuss the details of the day of the shooting with counsel. The Petitioner said, though, he provided detailed information to defense investigators. He said he filed the instant post-conviction petition after learning that counsel previously represented Mr. Young and that a conflict of interest existed.

The Petitioner testified that the prosecutor engaged in misconduct at the trial by introducing the pending solicitation to commit murder charge stemming from the letter discussed during Mr. Young's trial testimony and that trial counsel and co-counsel did not object to the evidence because counsel has previously represented Mr. Young. Upon examination of the trial transcript, the parties agreed that a jury-out hearing was held and that the jury never heard evidence of the pending solicitation to commit murder charge. The Petitioner stated, though, his issue stemmed from counsel's failure to object to the admission of the letter in which Mr. Young assisted. The Petitioner said that he would not have testified at the trial had he known of the conflict of interests.

The Petitioner testified that during the trial, the attorneys and the judge had conferences in an office adjoining the courtroom and that he did not know what transpired. The Petitioner said the State extended a plea offer for second degree murder in exchange for twenty-five years at 85% service. He said that had he known of the conflict of interests he would have not gone to trial.

The Petitioner testified that trial counsel told the jury during opening statements that the Petitioner was innocent but that counsel presented evidence of intoxication. The Petitioner said that counsel did not retain an expert to establish his intoxication but rather attempted to introduce a toxicology report reflecting the Petitioner's intoxication level through the medical examiner. The Petitioner said that the report was not admitted in evidence because counsel could not establish the chain of custody and that the trial court would not

15

permit counsel to present the witness who performed the analysis because counsel failed to provide notice of the witness's testimony. The Petitioner agreed, though, counsel cross-examined the medical examiner about the effects of the Petitioner's blood alcohol concentration of .235.

The Petitioner testified that he only received Randall Lotti's police statement before the trial. The Petitioner said that Brooke Whitaker and Evette McGee could have testified at the trial about his state of mind on the night of the shooting. The Petitioner said he told trial counsel about Ms. Whitaker because the shooting occurred at her home. The Petitioner said counsel also did not investigate the second bullet hole in the victim's car. The Petitioner said that counsel did not prepare a closing argument. The Petitioner said counsel told the jury that his closing argument was based upon counsel's memory of the testimony and that if counsel said something incorrect, the jurors should rely upon their memories.

On cross-examination, the Petitioner testified that his defense was he did not shoot the victim and that he knew who shot the victim. The Petitioner agreed that he wanted the jury to believe his testimony that he did not kill the victim and that he had a clear mind at the time of the shooting. The Petitioner said, though, that counsel should have presented evidence of his intoxication at the time of the shooting because the "mitigating evidence" could have resulted in a "dismissal" of the murder charge. He agreed the jury heard evidence that the Petitioner had consumed four quarts of beer and that he was intoxicated.

The Petitioner testified that had [sic] he "may have" pleaded guilty in exchange for twenty-five years at 85% had he known trial counsel represented Mr. Young. The Petitioner agreed that counsel learned Mr. Young would testify about five days before the trial and said that he would not have proceeded to the trial with counsel regardless of whether the plea offer was still available had he known of the conflict of interests. The Petitioner said he would have requested a new attorney because he would not have been able to trust counsel. The Petitioner agreed that Mr. Young testified that the Petitioner wrote a letter and that the Petitioner testified he wrote the letter. The Petitioner said the letter should not have been admitted at the trial because the trial was about LaShawn Nunnally's seeing the Petitioner shoot the victim and about the police officer's finding the murder weapon in the Petitioner's pants pocket. The Petitioner said that he would not have testified at the trial had he known counsel previously represented Mr. Young. The Petitioner agreed that his

> defense of innocence would have been the same with another attorney.
>
> The Petitioner testified that after the trial, he pleaded guilty to the solicitation charge related to the letter and that trial counsel represented him at the guilty plea hearing. The Petitioner acknowledged he testified at the homicide trial that he wrote the letter and that he would have been convicted of solicitation had he gone to trial.

*Id.* at \*14–33. After the evidentiary hearing, the post-conviction court denied both post-conviction and error coram nobis relief [Doc. 16-28 p. 48–73]. Petitioner then appealed, with the State again responding that the petition should be dismissed as untimely. *Id.* at \*43–44. The TCCA rejected the State's argument specifically noting its previous holding that the "statute of limitations was tolled," and the State's lack of application for permission to appeal that holding to the Supreme Court. *Id.* Ultimately, however, the TCCA affirmed the decision of the post-conviction court denying Petitioner relief. *Id.* The TSC likewise denied Petitioner permission to appeal on March 8, 2017 [Doc. 16-44].

On September 21, 2016, before the TCCA's dismissal of his final appeal, Petitioner filed his federal habeas petition [Doc. 1]. He subsequently filed a "Motion to Postpone Review of Current Petition," and the Court granted him an extension to file an amended petition [Docs. 4, 5]. Petitioner filed two subsequent amended petitions [Docs. 11, 20]. Respondent then filed an answer [Doc. 21] and Petitioner filed a reply [Doc. 22]. On April 16, 2019, the Court entered an order in which it (1) noted that Petitioner had stated his intention to file a traverse to Respondent's response to his petition, but had not done so; (2) noted that it did not appear that Petitioner filed his § 2254 petition within the AEDPA statute of limitations; (3) required Petitioner to show cause as to why this action should not be dismissed as untimely within fifteen days of entry of that order; (4) noted that the Tennessee Department of Correction listed a new address for Petitioner and directed the

17

Clerk to send the order to that address; and (5) notified Petitioner that if he did not timely comply with that order, this action would be dismissed [Doc. 23]. On June 26, 2019, after more than two months had passed during which Petitioner did not comply, the Court entered a Memorandum and Order dismissing Petitioner's petition for want of prosecution [Docs. 24, 25].

However, on July 8, 2019, Petitioner filed a document he entitled "motion of response/traverse," which he stated was in response to the Court's April 16, 2019 order [Doc. 26]. In this motion, Petitioner (1) states that he "was denied opportunity to have access to the legal library during extended lock-downs of restricted movement, along with transfers from one institution to another, both of which ha[ve] hindered his access to receive legal assistance and or [sic] receive, prepare and acquire legal information as it pertains to Petitioner['s] options of appellate review;" (2) argues that applying the statute of limitations to his § 2254 petition is unconstitutional due to the ineffective assistance of his counsel and his lack of knowledge of legal procedures; and (3) presents arguments regarding the merits of his claims for § 2254 relief [*Id.*]. The Court construed this filing as a motion for reconsideration pursuant to Rule 59(e) [Doc. 27]. The Court held that while Petitioner was not entitled to Rule 59(e) relief, upon subsequent review of the record, it did appear that Petitioner's claim regarding counsel's conflict of interest may be timely [*Id.*]. As Respondent had not set forth specific arguments regarding the timeliness of Petitioner's claims for §2254 relief, including whether the reasoning underlying the TCCA's finding that Petitioner was entitled to equitable tolling would also apply to Petitioner's claims for § 2254 relief under Sixth Circuit law, the Court directed the Clerk to reopen Petitioner's action and allowed Respondent to file an amended response and Petitioner to file a reply thereto [*Id.*]. Respondent complied, filing an amended answer [Doc. 33]; Petitioner did not file a reply. This matter is now ripe for review.

## II.     LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. §2254, which provides that a district court may not grant habeas-corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1), (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause if the state court decides a question of law or a materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To grant habeas relief under the "unreasonable application" clause, the Court must find that the state court's decision was an "objectively unreasonable," and not simply an erroneous or incorrect, application of the correct legal principle to the facts. *Id.* at 409–11. The AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). When the record supports the state court's findings of fact, those findings are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("Deference is necessary because a reviewing court, which analyzes only the transcripts[,]… is not as well positioned as the trial court.").

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by exhaustion requirements and the doctrine of procedural

default.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  In order for a claim to be considered on habeas review, the petitioner must first exhaust state remedies for that claim.  28 U.S.C. §2254(b)(1).  Exhaustion requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), ensuring that states have a "full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.  1990); *see O'Sullivan*, 526 U.S. at 842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court.  Tenn. S. Ct. R. 39.  If a claim has never been presented to the highest available state court and is now barred from such presentation by a state procedural rule, that claim is procedurally defaulted and barred from federal habeas review.  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  Procedural default may also occur when a petitioner presented the claim to the highest court, but the state court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground.  *Id.* (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir.  2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)).

Procedurally barred claims may be considered on their "merits only if the petitioner establishes (1) cause for his failure to comply with the state procedural rule and actual prejudice from the alleged violation of federal law or (2) demonstrates that his is 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Wallace v. Sexton*, 570 Fed. Appx. 443, 452 (6th Cir. 2014) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *See House v. Bell*, 547 U.S. 518, 536 (2006).  To show sufficient "cause," Petitioner must point to "some objective factor external to the defense" that

prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488. To demonstrate prejudice, Petitioner must show that the inadequacies worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The prejudice requirement is not met where there is strong evidence of a petitioner's guilt and lack of evidence for his claim. *Id.* at 172.[2]

## III. DISCUSSION

Petitioner raises many claims in his final amended petition, most relate to the ineffective assistance of counsel:

(1) Ineffective assistance of trial counsel where trial counsel formerly represented a witness who testified for the State at Petitioner's trial;

(2) Ineffective assistance of trial counsel where counsel:

    a. Failed to investigate Brooke Whitaker as a potential defense witness;

    b. Failed to investigate and present a defense regarding Petitioner's intoxication;

    c. Failed to investigate and present a mental health defense;

    d. Failed to interview arresting law enforcement officers;

    e. Failed to object to the introduction of the letter that formed the basis of Petitioner's later charge for solicitation to commit murder;

    f. Failed to object to cross-examination regarding the pending solicitation to commit murder charge; and

    g. Failed to present the results of a gunpowder residue test.

(3) Ineffective assistance of post-conviction counsel where counsel:

    a. Failed to obtain a witness statement from Brooke Whitaker;

---

[2] Where petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

b. Failed to interview and investigate Evetta McGee;

c. Failed to file a subpoena duces tecum on the police department to obtain the witness statements of Dana Brown;

d. Failed to conduct independent research or investigation;

e. Failed to obtain a mental health evaluation of the Petitioner or otherwise "refute the State's diagnosis of explosive disorder;

f. Failed to ascertain whether the arresting law enforcement officers were actually interviewed by trial counsel;

g. Failed to have two alcohol reports authenticated;

h. Failed to raise a claim that the trial court failed to advise Petitioner of trial counsel's conflict of interest;

i. Failed to raise a claim regarding the admission of evidence regarding Petitioner's pending solicitation charge;

j. Failed to present exculpatory evidence of a "second gunshot hole in the victim's car;" and

k. Failed to use the autopsy report to demonstrate that the victim's injuries were inconsistent with witness Nunnally's description.

(4) The trial court failed to advise Petitioner in open court about counsel's conflict of interest which it knew or reasonably should have known.

(5) Prosecutorial Misconduct

a. The State failed to disclose witness statements provided to the police to Petitioner; and

b. The State improperly misstated the law on intoxication during closing argument.

22

[Doc. 20]. Respondent argues that Petitioner's petition is untimely; that even if his conflict of interest claim is timely, it was properly decided by the TCCA and does not entitle Petitioner to relief; and that Petitioner's remaining claims are either procedurally defaulted, not cognizable on habeas corpus review, or were properly decided by the TCCA [Doc. 33].

### A. TIMELINESS

As a threshold matter, the Court must determine whether the instant petition is timely. While Petitioner did not address the timeliness of his petition in either his first or second amended petition, nor did he comply with the Court's order requiring him to show good cause as to why his petition should not be dismissed as untimely, in his later motion for reconsideration Petitioner claimed (1) that the statute of limitations was unconstitutional as applied to his case and (2) that he should be entitled to equitable tolling because he has been pursuing his rights diligently and his claims are "substantial" [Doc. 26 p. 2–3]. Respondent, however, argues that the petition is untimely, regardless of Petitioner's "later-arising claim" and that Petitioner is not entitled to equitable tolling [Doc. 33 p. 29–35]. The Court agrees that the instant petition is untimely.

Pursuant to the AEDPA, federal habeas petitions pursuant to §2254 must be filed within a one-year statute of limitations. 28 U.S.C. §2244(d)(1)(A). This one-year limitations period runs from the latest of the following:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

23

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). In most cases, subsection (A) provides the operative date and the one-year limitations period begins to run the day following "the date on which the judgment became final by the conclusion or direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A); *see* Fed. R. Civ. P. 6(a) (providing "the day of the act, event, or default from which the designated period of time begins to run shall not be included"). However, the Sixth Circuit has previously demonstrated that each claim within a petition need not fall under the same provision of § 2244(d)(1). More specifically, while subsection (A) typically begins the clock for a petitioner's habeas corpus filings, when one of a petitioner's claims falls under another enumerated provision, its timeliness should be assessed accordingly. *See e.g., Keeling v. Warden*, 673 F.3d 452, 461 (6th Cir. 2012); *DiCenzi v. Rose*, 452 F.3d 465, 468–69 (6th Cir. 2006).

Irrespective of the provision which triggers the running of the one-year limitations period, the AEDPA provides that the limitations period will be tolled for the "time during which a *properly filed* application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . " 28 U.S.C. § 2244(d)(2) (*emphasis added*). An appeal is properly filed when "its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). To determine if Petitioner's collateral attack was properly filed, the Court looks to how the state courts treated it. *Griffin v. Lindamood*, No. 2:16-CV-188, 2017 U.S. Dist. LEXIS 143996, at *10 (E.D. Tenn. Sept. 6, 2017).

Although a properly filed state application tolls the federal limitations period, any lapse of time *before* the state application was filed still counts against the limitations period. *Payton v. Brigano*, 256 F.3d 405, 408 (6th Cir. 2001). If the federal limitations period has fully expired at the time of filing, even a "properly filed" state court motion will not "revive" the statutory period.

24

*Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (holding that "[t]he tolling provision does not . . . 'revive' the limitations period [i.e., restart the clock at zero]; it can only serve to pause a clock that has not yet fully run").

In addition to the statutorily-provided tolling allowance, the one-year limitations period for §2254 petitions is also subject to equitable tolling where appropriate. *See Holland v. Florida*, 560 U.S. 631, 649 (2010). However, this doctrine should be used sparingly by district courts and only applies in limited circumstances. *Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003). Petitioner is "entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (*internal quotations omitted*).

With regards to the instant petition, the TSC denied Petitioner permission to appeal on May 12, 2003, and the judgments against him became final ninety days later, on August 11, 2003.[3] Accordingly, the AEDPA statute of limitations for Petitioner to challenge these judgments began August 12, 2003, and then expired on August 12, 2004. Although state collateral proceedings could have statutorily tolled the limitations period, neither of Petitioner's state post-conviction proceedings entitle him to statutory tolling because they were filed after the federal limitations period had already expired. Petitioner's first state court petition, filed April 22, 2005, was filed more than twenty months after the federal habeas corpus statute of limitations expired; accordingly, the associated proceedings could not serve to "revive" the already expired limitations period. *See Vroman*, 346 F.3d at 602. Moreover, because the state court treated this petition as untimely, it was not "properly filed" and could not then toll the statute of limitations. *See Artuz*, 531 U.S. at 8; *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) (holding that an untimely state court

---

[3] Ninety days is the period during which Petitioner could have, but did not, seek a writ of certiorari from the Supreme Court. *Jimenez v. Quarterman*, 555 U.S. 113, 120 (2009).

post-conviction petition is not "properly filed" in order to warrant statutory tolling). Although Petitioner later filed a second post-conviction petition, it was filed over seven years after the statute of limitations had ended and likewise could not revive the already-expired limitations period.[4] *See Vroman*, 346 F.3d at 602. Without the benefit of statutory tolling, Petitioner's federal habeas corpus petition, filed September 21, 2016, was filed more than twelve years after the AEDPA statute of limitations had expired. Accordingly, unless Petitioner can demonstrate some other basis for the Court to find either (1) that the statute of limitations pertaining to his petition did not begin to run when the judgments against him became final or (2) that he is entitled to equitable tolling, his claims are time-barred and cannot entitle Petitioner to relief.

Although Petitioner does not argue the timeliness of his instant petition within the petition, in state court proceedings Petitioner argued that his second post-conviction proceeding was timely because his claim that trial counsel had a conflict of interest was based on newly-discovered evidence [Doc. 16-14 p. 8, 22]. Under federal law, this would amount to argument that Petitioner's claim falls under 28 U.S.C. §2244(d)(1)(D), instead of §2244(d)(1)(A). Subsection (D) provides that Petitioner would have one year to file a petition from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. §2244(d)(1)(D). In these circumstances, Petitioner bears the burden of proving that he has exercised due diligence, *Lott v. Coyle*, 261 F.3d 594, 605–06 (6th Cir. 2001), which requires more than a showing that he "did not actually know" of the facts underlying his claim. *See Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002) (internal quotations omitted) (holding "an application 'that merely alleges that the applicant did not actually know the facts underlying his .

---

[4] The Court notes that the question of whether this petition was "properly filed" is complex, as it was originally treated as untimely, but later the TCCA found that Petitioner's circumstances warranted equitable tolling. However, even if the petition was properly filed, it could not revive an expired limitations period.

. . claim' is insufficient to show due diligence."); *McDonald v. Warden*, *Leb. Corr. Inst.*, 482 F. App'x 22, 29 (6th Cir. 2012) (holding "that a petitioner does not in fact learn sooner of the factual predicate of his new claim does not, ipso facto, establish that a diligent person in the petitioner's shoes also would not have done so sooner). "The question under the provision is not when prisoners first learned of the new evidence; it is when they should have learned of the new evidence had they exercised reasonable care." *Townsend v. Lafler*, 99 F. App'x 606, 608 (6th Cir. 2004).

Here, the Court cannot find that Petitioner has demonstrated that he exercised due diligence in discovering this claim or that it could not have been discovered earlier. The factual basis for this claim, that counsel had an alleged conflict of interest based on his prior representation of a State's witness, arose at the time of trial and, according to the record, was revealed during a sidebar in the trial judge's chambers during trial [Doc. 16-4 p. 38–41]. While the record does not indicate that Petitioner was present for this sidebar, and Petitioner has averred that he was not and that counsel did not disclose the contents of the sidebar with him, nearly eleven years elapsed from the emergence of the factual predicate of this claim to Petitioner's alleged discovery of it on or around May 10, 2012, despite the fact that the information was in the transcript of Petitioner's trial.[5] While Petitioner does not indicate when he first received the transcripts of his trial, he has provided no evidence or explanation as to why he did not review his transcripts for nearly a decade or regarding how he eventually discovered the alleged conflict of interest. *See Kelley v. Hall*, No. 3:19-cv-01041, 2021 U.S. Dist. LEXIS 45860, at *8 (M. D. Tenn. Mar. 11, 2021) (holding that although Petitioner claimed "'recent' discovery of an alleged conflict of interest" claim, the factual predicate for this claim "could have been discovered through the exercise of due diligence at any point after

---

[5] Petitioner claims in his most recent amended federal petition that he learned of counsel's alleged conflict on May 10, 2012; the TCCA previously found that Petitioner "claimed in his petition that he 'first learned of his counsel['s] multiple representations of the prosecution['s] eyewitness Mr. Young' on May 12, 2012" and included with his petition a sworn affidavit from Mr. Young "signed on May 10, 2012." *Woodard II*, 2014 Tenn. Crim. App. LEXIS 887, at *16.

counsel was appointed, thus precluding a later beginning of the statutory clock…"); *Grayson v. Grayson*, 185 F. Supp. 2d 747, 750–51 (E.D. Mich. 2002) (holding that where a petitioner fails to indicate the steps he took to discover his claims, he failed to show that the factual predicate could not have been discovered earlier). He certainly has not then offered argument to support that a duly diligent person in his circumstances would not have discovered the claim prior to 2012. *See DiCenzi*, 452 F.3d at 470 ("The proper task… is to determine when a duly diligent person in [petitioner's] circumstances would have discovered [evidence of the factual predicate].") (internal quotations omitted). Accordingly, Petitioner has not then met his burden of showing that this claim could not have been previously discovered through the exercise of due diligence.

Moreover, even if Petitioner could show that the claim could not have been previously discovered, even under the framework provided by §2244(d)(1)(D) it is not immediately apparent that Petitioner's claim is timely. Although Petitioner claims in the instant federal petition to have discovered the factual predicate on May 10, 2012, in his state court petition, Petitioner stated:

> Upon learning this alleged allegation of [trial counsel's] dual representation that took place in chambers. [sic] Petitioner began to seek out Mr. Young to see if these allegations that took place in chambers where [sic] substantial. Petitioner contacted members of family to help with locating Mr. Young but all leads were to no avail. After diligently pursuing every lead that petitioner could possibly obtain while incarcerated. [sic] Petitioner learned that Mr. Young had recently been jailed through reading the newspaper. Petitioner immediately contacted family members to inform them of Mr. Young's current location but to the petitioners [sic] dismay again Mr. Young had already been released. After several weeks and diligent search and inquiry petitioner received the Sworn Affidavit from Mr. Young.

[Doc. 16-14 p. 15]. Respondent correctly points out then that by Petitioner's own words, he discovered the factual predicate of this claim at least some time before the affidavit was received [Doc. 33 p. 32]. 28 U.S.C. § 2244(d)(1)(D) indicates that the statute of limitations begins to run at the time the factual predicate was or could have been discovered through the exercise of due

diligence, not from the time Petitioner was finished collecting evidence. *See Jurado*, 337 F.3d at 644 ("AEDPA does not convey a right to an extended delay while a habeas petitioner gathers every possible scrap of evidence that might support his claim."). By Petitioner's own indication, his second state court post-conviction petition, received by the court May 10, 2013,[6] was filed just shy of one year after he received the sworn affidavit but *more* than one year after he was able to discover the factual predicate of his claim. Accordingly, even if Petitioner's second post-conviction proceedings statutorily had tolled the federal statute of limitations, it appears that even the one-year federal limitations period set out in § 2244(d)(1)(D) had already expired at the time of filing, and Petitioner's filings could not then serve to revive it.

Finally then, the Court must consider whether Petitioner is instead entitled to equitable tolling of the statute of limitations. The Supreme Court has clarified that equitable tolling is available "in appropriate cases," where a petitioner (1) "has been pursuing his rights diligently" and (2) can show "that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418). Petitioner again bears the burden of proving that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "The doctrine of equitable tolling is applied sparingly by federal courts," and generally used "only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Vroman*, 346 F.3d at 604 (citations and internal quotation marks omitted).

While Petitioner did not address equitable tolling in his original or amended federal habeas petitions, in his motion for reconsideration Petitioner appears to argue that he is entitled to

---

[6] According to the prison mailbox rule, it appears that Petitioner submitted this petition on May 8, 2013. *See Houston v. Lack*, 487 U.S. 266 (1988) (holding that a pro se filing by an incarcerated inmate is deemed to be filed when the inmate delivers the filing to prison authorities for mailing).

equitable tolling because (1) the statute of limitations as applied to his case was unconstitutional, as it violated his due process rights in having his claims heard, and (2) he has been pursuing his rights diligently and his claims are substantial, not "stale or fraudulent" [Doc. 26 p. 2–3]. Petitioner does not clarify, but merely summarily states, that the record reflects that he has been pursuing his rights diligently [*Id.*]. Given the leniency afforded pro se petitioners, Petitioner seems to allege that he faced "extraordinary circumstances" because his "failure to seek relief within applicable time was/is a result of circumstances amounting to justifiable excuses, or excusable neglect based on lack of criminal procedure [sic] and ignorance of appellate procedure as options for relief" [*Id.* at 3–4]. He likewise argues that the Court has a duty to ensure pro se litigants do not lose their rights to a hearing on the merits due to ignorance of technical procedural requirements [*Id.*].

Upon the appeal of Petitioner's second state post-conviction petition, which the post-conviction court dismissed as untimely, the TCCA held that Petitioner had been pursuing his rights diligently and was entitled to equitable tolling. Specifically, the court noted:

> It appears that the petitioner's timely pursuit of relief was first hindered by, if true, his appellate counsel not informing him of the denial of his application for permission to appeal to the supreme court in 2003. Thereafter, the petitioner's filings have been summarily dismissed as untimely. Considering the procedural situation and cumulative claims in this case, the record suggests that the petitioner has been "pursuing his rights diligently" upon learning of such rights and that due process at least requires that the petitioner be afforded the opportunity to present proof as to his claims.

*Woodard II*, 2014 Tenn. Crim. App. LEXIS 887, at *29–30.

This Court, however, does not agree that Petitioner has borne the burden under Sixth Circuit law of proving that he has been pursuing his rights diligently. As noted by the TCCA, Petitioner alleged in his first untimely post-conviction petition, filed April 22, 2005, that he had been delayed in filing because counsel failed to alert him that the TSC had denied his application

for permission to appeal on May 12, 2003 [Doc. 16-23 p. 16–11].  Petitioner did not indicate that he reached out to counsel for any such updates.  Instead, according to Petitioner, he filed a motion to ascertain the status of his case on March 9, 2005, which the TSC responded to on March 25, 2005 by forwarding him a copy of the order denying his application [Doc. 16-23 p. 7].  Petitioner offered no evidence, then or now, to indicate that he took any measures to seek out the status of his case during the preceding twenty-two month period.

Although the Sixth Circuit has clarified that both the ineffective assistance of counsel and counsel's failure to notify a petitioner about the status of an appeal could satisfy the "extraordinary circumstances" element required for equitable tolling, *Keeling*, 673 F.3d at 462 (quoting *Robinson v. Easterling*, 424 F. App'x 439, 442 (6th Cir. 2011)), this does not negate a petitioner's need to also exercise due diligence.  *Robinson*, 424 F. App'x. at 442.  The Court has previously clarified that petitioners "who receive delayed notification of a state court judgement due to clerical or attorney errors may not seek equitable tolling if they 'passively await decision.'"  *Id.* at 443 (quoting *Miller v. Collins*, 305 F.3d 491,496 (6th Cir. 2002)).  The Court "has never granted equitable tolling to a petitioner who sat on his rights for a year and a half." *Id.*

Regardless of counsel's alleged failure to alert Petitioner to the status of his appeal, it was Petitioner's burden to monitor his own litigation and to diligently pursue his own rights.  Here, Petitioner appears to have "sat on his rights" for twenty-two months and has proffered no evidence that he was taking any measures to pursue his rights during this time frame.  Accordingly, Petitioner is not entitled to equitable tolling based on counsel's alleged failure to alert him to the status of his case. *Cf. Winkfield v. Bagley*, 66 F. App'x 578, 583–84 (6th Cir. 2003) (holding that Petitioner was not entitled to equitable tolling where counsel falsely led him to believe his appeal was still pending because petitioner did not monitor the progress of his own appeal); *Elliot v. Dewitt*, 10 F. App'x 311, 313 (6th Cir. 2001) (holding that petitioner was not entitled to equitable

31

tolling where he alleged that both the state court and counsel failed to inform him of the status of his appeal).

Moreover, even after the filing and denial of his first post-conviction petition, Petitioner continued to sit on his rights. He neither appealed the decision of the post-conviction court nor sought other relief from the state court for more than seven years. He did not seek federal relief for another eleven years. Although Petitioner's second post-conviction petition was based on allegedly "newly-discovered evidence," Petitioner likewise does not offer justification for the period of inaction preceding its filing and, as the Court clarified above, the record is bereft of other evidence that Petitioner was exercising due diligence with regard to "discovering" his new claims or bringing them forth in a timely manner. Simply put, this Court cannot find that Petitioner has been diligently pursuing his rights sufficient to warrant equitable tolling. Although Petitioner seems to have become more engaged with his own litigation in more recent years,[7] the doctrine of equitable tolling, meant to apply sparingly, will not extend to cover Petitioner's continual lack of diligence throughout his proceedings - late filings in state court, long periods of inactivity, and failing to appeal state court rulings.

As for Petitioner's argument that he was prohibited from, or delayed in, filing by his ignorance of the legal system and his pro se status, this likewise will not entitle Petitioner to equitable tolling. Even granted the leniency afforded to pro se petitioners, the Sixth Circuit has made it clear that "an inmate's lack of legal training, his poor education, [and] even his illiteracy does not give a court reason to toll the statute of limitations." *Cobas v. Burgess*, 306 F.3d 441,

---

[7] Although the Court notes that even during federal proceedings, Petitioner has seemingly filed last minute filings and failed to respond to the Court's show cause order regarding the timeliness of his petition until after the time to do so had expired and the Court had entered judgment against him.

444 (6th Cir. 2002) (citations omitted).  Because Petitioner has then shown neither due diligence nor extraordinary circumstances, the instant petition is time-barred.

### B.   MERITS

Even if Petitioner's claims were not time-barred, he would not be entitled to relief either because his claims are procedurally defaulted, not cognizable on habeas review, or because the TCCA's holding regarding his claims were not objectively unreasonable.  Petitioner raises eight claims of the ineffective assistance of trial counsel, eleven claims regarding the ineffective assistance of post-conviction counsel, one claim that the trial court erred when it failed to advise Petitioner of counsel's conflict of interest, and two claims of prosecutorial misconduct [Doc. 20]. Each claim will be discussed in turn below.

### a.   Sixth Amendment

Petitioner raises many claims regarding the ineffective assistance of trial counsel, including his above-discussed claim that counsel had a conflict of interest at the time of his representation of Petitioner.  To successfully prove that counsel was constitutionally ineffective, a petitioner must establish: (1) that counsel's performance was deficient such that he was no longer "functioning as the 'counsel' guaranteed under the Sixth Amendment," and (2) that counsel's "performance prejudiced the defense . . . so as to deprive the defendant of a fair trial" and undermine the reliability of trial results.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficiency, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.  To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

33

The state court's holding that counsel was not constitutionally ineffective creates a dual layer of deference which Petitioner must overcome to be entitled to relief. *Kelly v. Lazaroff*, 846 F.3d 819, 831–32 (6th Cir. 2017). The state court's holding is entitled to deference and counsel's performance is presumed to be constitutionally adequate. *Id.* To show that counsel was ineffective, his errors must have been well and truly outside the grounds of reasonable conduct and competent assistance, not just mere deviations from best practice.

### i. Conflict of Interest

Petitioner alleges that he received the ineffective assistance of counsel because trial counsel had an active conflict of interest at the time of his trial due to counsel's prior representation of one of the State's witnesses [Doc. 20]. Specifically, Petitioner avers that counsel represented State's witness Henry Young simultaneously to his representation of Petitioner and, in fact, advised Mr. Young to testify against Petitioner in order to receive leniency from the State [*Id.*].[8] Petitioner contends that he would have neither proceeded to trial with counsel as his representative nor testified at his trial had he known of the conflict of interest [*Id.*]. Respondent counters that this claim is meritless because counsel did not have a conflict of interest and thus, "the state court's decision was not contrary to, or an unreasonable application of, Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the evidence" [Doc. 33 p. 35]. The Court agrees with Respondent.

Petitioner raised this claim in his second post-conviction petition and subsequent appeal. Upon remand, the post-conviction court found that Petitioner was not entitled to relief and the TCCA affirmed. *Woodard III*, 2016 Tenn. Crim. App. LEXIS 847, at *52–55. The TCCA applied *Cuyler v. Sullivan* and noted that "[i]n order to demonstrate a violation of his Sixth Amendment

---

[8] Petitioner supports this allegation with an affidavit signed by Mr. Young.

rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at *52 (quoting *Cuyler*, 446 U.S. 335, 350 (1980)). The court further noted that a "possible conflict of interests is insufficient to establish the constitutional violation." *Id.* Ultimately, the court held that based on the timeline of the proceedings, there was no conflict of interest.

> The offense date in the Petitioner's case was April 13, 2001, and the trial occurred in October 2001. Trial counsel admitted previously representing Mr. Young and said his representation ended on August 2, 2001. Counsel was unaware of Mr. Young's connection to the Petitioner's case during counsel's representation of Mr. Young, and counsel and Mr. Young confirmed they never discussed the Petitioner's case during counsel's representation of Mr. Young. On October 5, 2001, more than two months after counsel ended his representation of Mr. Young, counsel received the State's supplemental witness list in the Petitioner's case, which indicated Mr. Young would testify at the Petitioner's trial. At that time, counsel did not represent Mr. Young, and it had been two months since counsel had spoken with Mr. Young. Upon learning Mr. Young would testify at the Petitioner's trial, counsel spoke with Mr. Young, who provided limited information to counsel consistent with his trial testimony regarding the Petitioner's letter. Mr. Young testified at the post-conviction hearing that he did not regard this conversation with counsel as important or confidential. The record reflects that Mr. Young did not receive any benefit from the State in exchange for his testimony because his criminal cases had been resolved by August 2, 2001. We note the Petitioner did not present evidence that Mr. Young received any benefit from testifying at the Petitioner's trial.
>
> Likewise, trial counsel and Mr. Young both testified at the post-conviction hearing that counsel did not advise him to testify against the Petitioner. Counsel's credited testimony reflects that counsel did not obtain confidential information relevant to the Petitioner's case during counsel's representation of Mr. Young and that counsel and Mr. Young did not discuss any prior bad acts, criminal conduct, or specific instances of conduct that could have been used to impeach Mr. Young at the Petitioner's trial. Nothing about counsel's representation of Mr. Young would have impaired counsel's ability to represent the Petitioner. We note that the Petitioner did not present any impeaching evidence at the post-conviction hearing and that the record reflects the prosecutor questioned Mr. Young on

> direct examination about Mr. Young's previous criminal convictions and criminal behavior.

*Id.* at \*52-55.

The Sixth Amendment right to counsel has been held to include the right to representation which is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.") (citations omitted). While a mere "possibility of conflict is insufficient to establish a violation of [the petitioner's] Sixth Amendment rights, and no violation occurs where the conflict is irrelevant or merely hypothetical," *Harbison v. Bell*, 408 F.3d 823, 836 (6th Cir. 2005) (citing *Moss v. United States*, 323 F.3d 445, 463–64 (6th Cir. 2003)), an "actual conflict of interest," or one which "adversely affects counsel's performance," renders counsel ineffective, *Gillard v. Mitchell*, 445 F.3d 883, 890 (6th Cir. 2006) (internal citations and quotations omitted). Where a petitioner did not raise objection at trial, he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348.

One form of potential conflict, successive representation, "occurs where defense counsel has previously represented a co-defendant or trial witness." *Moss v. United States*, 332 F.3d 445, 459 (2003) (citations omitted). Where a petitioner's claim is based on successive representation, rather than joint or multiple representation, the Court analyzes counsel's performance under the *Strickland* standard for ineffective assistance of counsel. *Stewart v. Wolfenbarger*, 468 F.3d 338, 350–51 (6th Cir. 2006). Under this test, Petitioner "must establish both that his trial counsel suffered from an actual conflict of interest and that the conflict of interest adversely affected the quality of representation." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 844 (6th Cir. 2017). It is more difficult for a petitioner "to show that counsel actively represented

36

conflicting interests in cases of successive rather than simultaneous representation;" with "the most common example of an actual conflict of interest arising from successive representation… where an attorney's former client serves as a government witness against the attorney's current client at trial." *Moss*, 332 F.3d at 460 (citations omitted).

The state court's holding was neither contrary to nor an unreasonable application of federal precedent, nor did it involve unreasonable factual findings. The TCCA correctly applied *Cuyler* to find that petitioner had to demonstrate an actual conflict of interest which adversely impacted counsel's performance in order to warrant relief. Like the state court, this Court finds that Petitioner has not done so. First, the Court notes that the record supports the state court's factual finding that counsel's representation of Mr. Young had ceased by the time of Petitioner's trial and prior to Mr. Young being added to the witness list; Petitioner has not offered clear and convincing evidence to rebut this finding. *See* 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 339 ("Deference is necessary because a reviewing court, which analyzes only the transcripts[,]… is not as well positioned as the trial court."). While counsel testified that he did meet with and talk to Mr. Young, both counsel and Mr. Young testified that nothing confidential or privileged was discussed during this meeting and that his representation of Mr. Young was unrelated to Petitioner's trial [Doc. 16-29]. Petitioner also offers no evidence to support his contention that Mr. Young received a benefit for his testimony against Petitioner and his claim is undermined by the timeline, which demonstrates that Mr. Young's charges were disposed of by the time of Petitioner's trial [Doc. 16-30].

Petitioner has not pointed to any specific adverse effects of counsel's alleged conflict of interest. Although Petitioner does seem to take umbrage with co-counsel conducting the cross-

examination of Mr. Young, rather than counsel[9], he does not offer any argument as to how this negatively impacted counsel's representation or his trial. In fact, having co-counsel cross-examine the witness minimized some of the risk clarified by the Sixth Circuit. *See Takacs v. Engle*, 768 F.2d 122, 125 (6th Cir. 1985) ("[A] defendant's counsel's prior representation of a government witness can sometimes lead to ineffective assistance. The principal problem in such cases is that a counsel's cross-examination of his prior client may be inhibited by his knowledge of privileged information."). Petitioner has simply not offered any evidence, nor did the Court find any in the record, that counsel's representation of Petitioner was in any way adversely affected by his prior representation of Mr. Young. While these facts did present a potential conflict of interest, it appears that counsel's prior representation of Mr. Young never ripened into an actual conflict of interest and accordingly will not entitle Petitioner to relief.

### ii. Ineffective Assistance of Trial Counsel

Petitioner raises seven remaining claims related to his Sixth Amendment right to counsel, regarding trial counsel's performance: (1) trial counsel failed to investigate a potential defense witness, (2) trial counsel failed to investigate and present a defense of intoxication, (3) trial counsel failed to investigate and present a mental health defense, (4) trial counsel failed to interview the arresting law enforcement officers, (5) trial counsel failed to object to the introduction of a letter which was the basis for Petitioner's pending solicitation to commit murder charges, (6) trial counsel questioned Petitioner about his pending charge of solicitation, and (7) trial counsel failed to present the results of a gunpowder residue test [Doc. 20]. Respondent contends that claims (6)

---

[9] The Sixth Circuit has previously noted that "[t]he fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." *Moss*, 332 F.3d at 460 (citations omitted).

and (7) are procedurally defaulted, and thus barred from review, and that claims (1) through (5) were properly decided by the TCCA [Doc. 33 p. 38-54].

### 1. Procedurally Defaulted Claims

While Petitioner raised claims (1) through (5) to the TCCA during his second state court post-conviction proceedings, and the TCCA addressed those claims, it does not appear that Petitioner raised claim (6), that counsel "subjected the Appellant to the questioning about the pending charge of solicitation… [which] confirmed the conviction of the pending charge before the Appellant [sic] went on [sic] court on the pending charge,"[10] or claim (7) that trial counsel failed to "prepare the evidence of the gunpowder residue test," during any of his proceedings before the TCCA. Due to Tennessee's one-year statute of limitations and one petition rule, state remedies are now foreclosed to Petitioner and these claims, while technically exhausted, are procedurally defaulted. Tenn. Code Ann. § 40-30-102; *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Wallace v. Sexton*, 570 F. App'x 443, 449 (6th Cir. 2014). Because Petitioner has not argued cause and prejudice to excuse the default of these claims, they will not now be reviewed on their merits. *See Hand v. Houk*, 871 F.3d 390, 409 (6th Cir.) (declining to address the merits of Petitioner's claim where Petitioner's claim was correctly found to be procedurally defaulted and Petitioner "did not argue cause and prejudice to excuse his default.").

### 2. Possible Defense Witness

Petitioner claims that trial counsel was ineffective where he failed to investigate or present Brooke Whitaker as a potential defense witness [Doc. 20 p. 27]. The Court gathers that Petitioner

---

[10] While it does appear that Petitioner challenged counsel's lack of objection to the admission of the solicitation letter in state court proceedings, it does not appear that he raised a claim to the TCCA regarding counsel's lack of objection to cross-examination of Petitioner about the solicitation letter. Because exhaustion requires a Petitioner to raise the same claim under the same theory, this claim is procedurally defaulted. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987) (citing *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987)).

39

alleges that the "incident," presumably the shooting, occurred at or near Ms. Whitaker's residence and that counsel was unaware of that fact [*Id.*]. Petitioner also mentions relative to this claim that Witness Nunnally testified at trial that neither she, Petitioner, nor the victim were at Ms. Whitaker's residence [*Id.*]. Respondent argues that the post-conviction court made a credibility determination in favor of trial counsel over Petitioner which is entitled to deference on habeas review and that Petitioner has not demonstrated that Ms. Whitaker possessed favorable testimony which would have impacted the outcome of his trial [Doc. 33 p. 46].

At post-conviction evidentiary hearings Petitioner testified that he told trial counsel about Ms. Whitaker because the shooting occurred at her home; he believed counsel should have called Ms. Whitaker as she could have testified at trial regarding his state of mind the evening of the shooting. *Woodard III*, 2016 Tenn. Crim. App. LEXIS 847, at *31. Counsel, however, testified that no one had given him Ms. Whitaker's name to investigate and that although he was currently familiar with Ms. Whitaker due to his later representation of her, the first he heard of her relative to Petitioner's case was when he read Petitioner's post-conviction petition. *Id.* at *16, 22. He did not recall whether he knew the offense occurred near her home. *Id.* at *16.

After the evidentiary hearing on Petitioner's second post-conviction petition, the TCCA first noted that:

> Relative to the Petitioner's claim that trial counsel failed to present as a defense witness Brooke Whitaker, who would have provided exculpatory testimony, the post-conviction court found that counsel was unaware until the post-conviction hearing that Ms. Whitaker was a potential witness. The court found that Ms. Whitaker was not presented at the evidentiary hearing and that counsel did not provide deficient performance because Ms. Whitaker's name was not provided to trial counsel, although Ms. Whitaker was known to the Petitioner. The court found that the Petitioner presented no evidence that the outcome of the trial would have been different had Ms. Whitaker's testimony been offered. The court noted that Ms. Whitaker was incarcerated, along with Ms. McGee, for a rape committed at the Bedford County Jail.

*Id.* at *34–35. The TCCA did not go on to specifically analyze this claim but rather applied *Strickland* and generally affirmed the post-conviction court's finding. *Id.* at *47.

Petitioner's claim here involves two distinct claims, the failure to investigate a witness and the failure to call a witness, *see English v Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010), either of which can constitute ineffective assistance of counsel, *Clinkscale v. Carter*, 375 F.3d 440, 443 (6th Cir. 2004). To determine if counsel was ineffective for failing to investigate, the Court must assess the reasonableness of counsel's "investigation of lack thereof." *Id.* at 726. As with all ineffective assistance claims, Petitioner must still demonstrate prejudice resulting from this action. *Strickland*, 466 U.S. at 687. To show that counsel was ineffective for failing to call witnesses, Petitioner must establish that the witness had favorable information and the lack of that witness's testimony prejudiced his defense. *Pillette v. Berghuis*, 408 F. App'x 873, 882–83 (6th Cir. 2010)(citing *Towns v. Smith*, 395 F.3d 251, 258–60 (6th Cir. 2005)). However, "defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).

The Court cannot find that the TCCA's holding that counsel was not ineffective for failing to investigate or call Ms. Whitaker as a witness was contrary to or an unreasonable application of federal law or involved unreasonable factual findings. Here, Petitioner summarily states that Ms. Whitaker could have testified on his behalf, as the "incident" occurred at her residence, and that she could have testified to his state of mind at the time of the incident, by which the Court presumes Petitioner means his intoxication. However, Petitioner has offered no evidence to rebut counsel's testimony that he had not heard of Ms. Whitaker's connection to Petitioner's case, nor demonstrated that counsel should have known of her potential to testify as a witness. The trial court's credibility determination in favor of counsel is entitled to deference. *Miller-El*, 537 U.S.

41

at 339.  Moreover, despite Petitioner's unsupported claim that Ms. Whitaker could have provided favorable testimony, he did not present Ms. Whitaker at his post-conviction evidentiary hearings and has offered no other evidence that Ms. Whitaker could or would have provided testimony which exculpated Petitioner.  *See Millender*, 376 F.3d at 527.  Where Petitioner has not shown that the failure to call this witness prejudiced his defense, he is not entitled to relief.  *Pillette*, 408 F. App'x at 882–83.

### 3. Intoxication and Mental Health Defense

Petitioner challenges counsel's failure to use either his intoxication on the night of the shooting or his psychiatric history as a "defense to premeditation" [Doc. 20 p. 28].  Petitioner claims that although counsel testified that he discussed the possibility of using Petitioner's intoxication or psychiatric history as a defense with Petitioner, counsel failed to present either of these defenses at trial [*Id.*].  Petitioner also claims counsel was ineffective when he failed to investigate or present expert testimony regarding Petitioner's intoxication or psychiatric history [*Id.*].  Further supporting this claim regarding his intoxication, Petitioner alleges that counsel failed to obtain a medical report regarding Petitioner's intoxication at the time of the crime, which indicated that Petitioner's blood alcohol level was at .235 percent, and only received the report at trial [*Id.* at 27].  Once counsel received the report, counsel attempted to change Petitioner's defense to "I'm innocent, but if I'm found guilty then I was intoxicated" without Petitioner's permission but was prohibited from introducing the report because he had failed to comply with state rules of criminal procedure [*Id.* at 28].  Respondent argues that because trial counsel made a strategic choice based on Petitioner's wishes to present a defense of innocence, the TCCA's holding that counsel was not ineffective when he failed to use all avenues to present evidence of Petitioner's intoxication and psychiatric history, which would not have been relevant to Petitioner's innocence, was not unreasonable [Doc. 33 p. 46–50].

At Petitioner's post-conviction evidentiary hearing, counsel testified that as Petitioner's defense was that he did not commit the shooting, neither his psychiatric history nor his state of intoxication was relevant to Petitioner's defense. *Woodard III*, 2016 Tenn. Crim. App. LEXIS 847, at *15–16. Counsel felt that calling a mental health expert was unnecessary relative to Petitioner's intent where Petitioner was pleading innocence and also felt that requesting an expert to testify about Petitioner's diagnosis of "depression cause by legal difficulties… was pointless." *Id.* Regarding presenting Petitioner's psychiatric history, counsel reported being apprehensive about presenting this evidence because Petitioner had "been previously diagnosed with 'intermittent explosive disorder' which counsel described as 'flying off the handle' and committing violent acts." *Id.* at *16. He likewise did not seek to introduce further mental health records because then the jury would have received evidence that Petitioner owned a firearm and had fired it during a struggle with his father. *Id.* at *24. Furthermore, counsel was worried that on cross-examination an evaluating psychiatrist would have testified about Petitioner's "disruptive, aggressive, and violent behaviors" and that Petitioner did not have any mental illnesses which would have required inpatient treatment. *Id.*

While counsel did not believe that Petitioner's intoxication was relative to his defense, evidence was presented to the jury that Petitioner drank several "quarts" of beer and was intoxicated on the day of the shooting. *Id.* at *22. Counsel did not call an expert to testify about Petitioner's intoxication because other evidence was produced at trial that demonstrated that Petitioner had been drinking the day of the offense. *Id.* at *16. Co-counsel testified that Petitioner was insistent about pursuing a not guilty verdict instead of attempting an intoxication defense. *Id.* at *25. While Petitioner agreed on cross-examination that he wanted the jury to believe his testimony that he did not kill the victim and had a clear mind at the time of the shooting, Petitioner

43

believed counsel should have presented evidence of his intoxication "because the 'mitigating evidence' could have resulted in a 'dismissal' of the murder charge." *Id.* at *32.

The TCCA first summed up the post-conviction trial court's holding:

> Relative to the Petitioner's claim that trial counsel failed to investigate and employ the use of experts relative to the scientific evidence, the post-conviction court found that little evidence was presented at the evidentiary hearing that the use of experts would have had a reasonable probability of affecting the jury's verdict. The court found that the jury was presented with evidence relative to the Petitioner's consuming four quarts of beer shortly before the shooting and that counsel cross-examined the medical examiner about the effects of alcohol. The court stated that the Petitioner's claim that counsel was deficient by failing to obtain experts on the issue of intoxication to rebut proof of premeditation was "curious" based upon the claim counsel was deficient by changing the defense theory during the trial.
>
> …
>
> Relative to the Petitioner's claim that trial counsel failed to review laboratory reports and medical records and failed to obtain an expert to review these documents, the post-conviction court found that counsel reviewed these records and knew the Petitioner had been diagnosed with intermittent explosive disorder. The court determined that, given the nature of the first degree murder charge, presenting the records at the trial would have caused harm because the records discussed the Petitioner's violent tendencies. The court found that no evidence offered at the post-conviction hearing would have affected the jury's verdict if it had been presented at the trial. The court noted that the Petitioner adamantly claimed he was innocent and found that the chosen defense strategy resulted in the records having little evidentiary value.
>
> Relative to the Petitioner's claim that trial counsel failed to procure funding for expert witnesses relative to the Petitioner's intoxication and mental state at the time of the offense, the post-conviction court found that counsel cross-examined the medical examiner on the effects of consuming alcohol. The court found that the jury heard evidence of the Petitioner's intoxication at the time of the shooting and that as a result, the evidence was presented to the jury. The court noted that the evidence of the Petitioner's intoxication and the effects of alcohol was immaterial because the Petitioner claimed he was innocent.

…

> Relative to the Petitioner's claim that trial counsel failed to choose a trial strategy based upon adequate investigation, the post-conviction court found that the Petitioner claimed he did not shoot the victim, rendering his mental health problems and intoxication at the time of the shooting immaterial. The court concluded that the Petitioner's guilty was established with "considerable proof" at the trial and found that the Petitioner forced counsel to defend the case based upon the Petitioner's innocence rather than by offering mitigating evidence that 'might of might not have" resulted in a conviction for a lesser included offense….

> …

> Relative to the Petitioner's claim that trial counsel abandoned the initial defense that the Petitioner was not the shooter and presented evidence at the trial of the Petitioner's intoxication as a means to negate the element of premeditation, the post-conviction court found after reviewing the trial transcript that counsel did not change defense strategy mid-trial. The court found that counsel's focus during the opening statement, the proof, and the closing argument was that Mr. Hill was the shooter. The court found that questioning the medical examiner about the effects of intoxication was not inconsistent with the chosen defense.

*Id.*, at *35–41. The TCCA then went on to hold that the post-conviction court properly denied relief for Petitioner's claim that trial counsel failed to adequately investigate "the viability of possible defense associated with the Petitioner's mental health and intoxication." *Id.* at *46–49. The court found that the record supported that "Petitioner's claim of innocence rendered immaterial the Petitioner's mental health and intoxication and that the Petitioner's denial of involvement in the shooting prevented a defense of mitigating evidence in an effort to obtain a conviction for a lesser included offense of first-degree murder." *Id.* at *49. The TCCA noted that in addition to being minimally relevant, counsel testified that he had reviewed Petitioner's mental health records and determined that introducing Petitioner's diagnosis of intermittent explosive disorder, through either records or an expert witness, bore risks for Petitioner's defense,

particularly where Petitioner and the victim were involved in a physical altercation hours before the shooting. *Id.* at *47. Regarding Petitioner's claim that counsel failed to present his intoxication as a defense, the TCCA noted that the jury did in fact hear evidence that Petitioner had drank "four quarts of beer" shortly before the shooting and about the effects of alcohol consumption. *Id.* The court also went on to note that Petitioner did not present an expert witness at the post-conviction hearing regarding either his mental health or intoxication to demonstrate how the use of either "would have impacted the outcome of the trial notwithstanding his claim he was not the shooter," which then prevented Petitioner from establishing prejudice. *Id.* at *47–48 (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

The TCCA's holding that counsel was not constitutionally ineffective is neither contrary to nor an unreasonable application of federal law, nor based upon an unreasonable determination of the facts. The defense presented throughout Petitioner's trial centered on Petitioner's claim that he did not shoot the victim and that someone else had actually committed the shooting. Petitioner has offered no evidence to rebut trial counsel and co-counsel's credited testimony that Petitioner was adamant about maintaining his innocence and pursuing a not-guilty verdict. *See Miller-El*, 537 U.S. at 339 (holding that state court credibility determinations are entitled to deference). Even at post-conviction hearings several years after Petitioner's trial, Petitioner still conceded that he told counsel he was innocent and wanted to pursue a defense that he did not shoot the victim.

In response to Petitioner's wishes, counsel presented a defense that Petitioner was innocent and someone else had committed the shooting; despite counsel's awareness of both Petitioner's intoxication and psychiatric history, this defense then limited the opportunity and need to present factors which may have mitigated Petitioner's capacity to premeditate the shooting. Regarding Petitioner's intoxication, while trial counsel does not appear to have offered a "defense" of

intoxication, the record does reflect that the amount of alcohol Petitioner had consumed along with the effects of doing so were presented to the jury. Counsel likewise made a strategic choice not to introduce Petitioner's psychiatric history, fearing that it would open the door to information about Petitioner's past issues with violent outbursts, which the Court will not second guess. *See Strickland*, 466 U.S. at 689 (holding that strategic decisions made by counsel are entitled to deference even when those decisions are ultimately unsuccessful). While Petitioner takes umbrage with counsel's failure to hire expert witnesses to testify to his intoxication or his psychiatric history, Petitioner has not presented either such witness in order for the Court to determine whether prejudice occurred from counsel's declining to do so. *See Fritts v. Perry*, No. 3:19-CV-031-RLJ-JEM, 2022 LEXIS 35431, at *96–97 (E.D. Tenn. Feb. 28, 2022); *see generally Harrington v. Richter*, 562 U.S. 86 (2011) (holding that counsel is not deficient for failing to hire expert testimony, even when that testimony may have been useful, where counsel had a reasonable strategic reason for doing so and took other measures to counteract the State's evidence). Where Petitioner has demonstrated neither deficiency nor prejudice on behalf of counsel, he is not entitled to relief.

### 4. Interviewing Law Enforcement Officers

Petitioner claims that counsel was ineffective where he failed to interview the law enforcement officers who arrested Petitioner [Doc. 20 p. 29]. Respondent contends that this claim is meritless as the record reflects that the defense team did in fact interview the law enforcement officers involved in Petitioner's arrest [Doc. 33 p. 50-51]. The Court agrees with Respondent. Despite Petitioner's contention, trial counsel testified that while he could not remember whether he personally or the defense team's investigator interviewed the arresting officers, someone from the defense team interviewed the officers. Petitioner's summary argument inapposite, without more, will not overcome the state court's holding crediting counsel's testimony.

### 5. Solicitation Letter

Petitioner argues that counsel was ineffective for failing to object to the State's presentation of a letter, written by Petitioner while in prison, which formed the basis for Petitioner's pending charge of solicitation [Doc. 20 p. 29]. Respondent argues that the state court's holding that counsel was not ineffective is not unreasonable where Petitioner failed to offer a basis by which the letter could have been excluded [Doc. 33 p. 51]. The Court agrees with Respondent.

At Petitioner's trial, the State produced a letter written by Petitioner in which he requested a friend, Chris Hodge, to "hook up with Mickey and burn [Shawn Nunnally's] house down" to prevent her from testifying at his upcoming court hearing. *Woodard III*, 2016 Tenn. Crim. App. LEXIS 847, at *10. At his post-conviction evidentiary hearing, Petitioner alleged that the prosecution committed misconduct by introducing his pending solicitation to commit murder charge, which stemmed from the letter introduced during Mr. Young's trial testimony. *Woodard III*, 2016 Tenn. Crim. App. LEXIS 847, at *29. After the parties agreed that the jury never heard about the pending charges, Petitioner explained that he took umbrage with "counsel's failure to object to the admission of the letter in which Mr. Young assisted." *Id.* at *29–30. While Petitioner admitted that he testified at trial that he wrote the letter, he still argued that the letter was irrelevant to his trial, which was only about the shooting of the victim, not the solicitation charge. *Id.* at *33. Counsel testified that he did not object to the letter because Petitioner admitted to writing it. *Id.* at *20.

With regards to this claim, the TCCA found that counsel was not deficient where Petitioner had not shown a basis for excluding the letter:

> The Petitioner argues that trial counsel failed to challenge the admission of the letter the Petitioner wrote while in the jail. He asserts that no trial witnesses identified the handwriting as the Petitioner's and that "it is possible that the State might not have been able to introduce the letter if counsel would have objected to its

48

admission." The State responds that the post-conviction court properly denied relief.

The record reflects that the letter was read to jury by State's witness Rhonda Hill. She testified that she received the letter in the mail, although it was addressed to her son, Chris Hodge. She said that the return address was the jail and that the name associated with the return address was Dana Brown, Ms. Hill's former neighbor. Ms. Hill noted Mr. Brown's name was misspelled and said she opened the letter. The letter stated the following:

> Chris, . . . [t]his s---is real. I need you to do something cause this stupid . . . b----named Shawn is running her mouth, tell s---. Hey, I need you to stop this ho from making this court date, June 18th. Hook up with Micky and burn this b----house down. Micky will tell you where the ho lives at. You dig. This is the ho that is making the charge, me with first-degree murder and this 51 top off. That's life. Stay on your feet. Much love, Juvy.

Mr. Young testified at the trial that he and the Petitioner were housed in the same cell block at the jail and that after the Petitioner's preliminary hearing, the Petitioner began writing a letter. Mr. Young stated that he knew "a little" about the letter's content and that the Petitioner was attempting to "get something taken care of with Shawn" Nunnally. Mr. Young said he saw the Petitioner writing the letter and that the Petitioner asked him how to spell a couple of words. Mr. Young identified the letter read by Ms. Hill as the letter the Petitioner wrote. Mr. Young said the Petitioner's nickname was "Juvy." On cross-examination, Mr. Young testified that he did not read the Petitioner's letter and that the Petitioner claimed Ms. Nunnally was lying to the police.

The Petitioner testified at the trial that he wrote the letter and admitted he asked Mr. Hodge to burn Ms. Nunnally's house because Ms. Nunnally was lying and because he was scared. The Petitioner said he did not know what else to do to make Ms. Nunnally stop lying about whether he shot the victim.

The record reflects that counsel did not object to the admission of the letter because the Petitioner admitted to counsel that he wrote the letter. The Petitioner testified at the trial that he wrote the letter, rendering a handwriting expert unnecessary. Likewise, the Petitioner did not deny writing the letter at the post-conviction hearing. In any event, the Petitioner did not present a handwriting

49

expert at the post-conviction hearing, nor did he offer any evidence to show that he did not write the letter or that the letter was inadmissible. *See Black*, 794 S.W.2d at 757. Therefore, we conclude that the record does not preponderate against the post-conviction court's conclusion that counsel did not provide ineffective assistance of counsel. The Petitioner is not entitled to relief on this basis.

*Woodard III*, 2016 Tenn. Crim. App. LEXIS 847, at *49–52.

The Court cannot find that the TCCA's holding was contrary to or an unreasonable application of federal law nor that it involved unreasonable factual findings. The letter was authenticated by two separate witnesses, Rhonda Hill, who found the letter in her mail with a return address from Bedford County Jail, and Henry Young, a fellow inmate who witnessed Petitioner writing the letter. Petitioner likewise admitted to writing the letter. Because the letter is apparently relevant and probative and Petitioner has offered no reasonable grounds on which it could have been excluded, the Court does not find that the state court was unreasonable in finding that trial counsel was not deficient for failing to object to the introduction of the letter. *See Kelly v. McKee*, 847 F.3d 316, 325 (6th Cir. 2017) (holding that trial counsel is not ineffective for failing to raise meritless objections).

### b. Ineffective Assistance of Post-Conviction Counsel

For ground three of his petition, Petitioner raises eleven claims alleging the ineffectiveness of post-conviction counsel's representation [Doc. 20 p. 31–32]. Simply put, these claims are not cognizable in federal habeas corpus proceedings. As "[t]here is no constitutional right to an attorney in state post-conviction proceedings," a petitioner then "cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). Accordingly, each of Petitioner's subclaims falling under ground three is dismissed.

### c. Trial Court Error

50

Petitioner claims that the trial court erred by failing to advise him of counsel's conflict of interest, despite learning about the conflict during the course of Petitioner's trial [Doc. 20 p. 33]. Although Respondent contends that Petitioner acknowledges that this claim is procedurally defaulted [Doc. 33 p. 55], the Court finds that Petitioner argues that he "raised [this] issue at the post-conviction hearing" [Doc. 20 p. 33]. However, after reviewing both Petitioner's state court post-conviction appellate brief [Doc. 16-38] and the post-conviction evidentiary hearing transcripts [Doc. 16-33 p. 86–87], the Court does not find that Petitioner properly raised this issue to the TCCA on appeal.[11] As the time for doing so has passed due to Tennessee's one-year statute of limitations and one petition rule, this claim is then procedurally defaulted. *See* Tenn. Code Ann. § 40-30-102; *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Wallace v. Sexton*, 570 F. App'x 443, 449 (6th Cir. 2014). Because Petitioner has not argued cause and prejudice to excuse the default of these claims, they will not now be reviewed on their merits. *See Hand v. Houk*, 871 F.3d 390, 409 (6th Cir.) (declining to address the merits of Petitioner's claim where Petitioner's claim was correctly found to be procedurally defaulted and Petitioner "did not argue cause and prejudice to excuse his default.").

### d.      Prosecutorial Misconduct

Petitioner raises two claims of prosecutorial misconduct: (1) that the State withheld certain witness statements from discovery and (2) that the State improperly argued in closing arguments that Petitioner "gets no credit for voluntary intoxication" [Doc. 20 p. 34]. Like Petitioner's claim of trial court error, after reviewing the record, the Court does not find that Petitioner properly exhausted this claim to the TCCA in his post-conviction appellate brief [Doc. 16-38]. Because

---

[11] Petitioner points to the transcripts of his evidentiary hearing where when asked if he had anything further Petitioner stated that the trial court should have alerted him in open court to the conflict of interest. However, the State specifically objected to Petitioner's attempt to raise a new ground which had not been pled in his petition and the Court did not hear further argument on this issue [Doc. 16-33 p. 86–87].

state remedies are now foreclosed to Petitioner, this claim is procedurally defaulted.  *See* Tenn. Code Ann. § 40-30-102; *Rust*, 17 F.3d at 160; *Wallace*, 570 F. App'x at 449.  Likewise, because Petitioner has not plead cause and prejudice, these claims are dismissed.  *See Hand*, 871 F.3d at 409 (declining to address the merits of Petitioner's claim where Petitioner's claim was correctly found to be procedurally defaulted and Petitioner "did not argue cause and prejudice to excuse his default."); *Wogenstahl*, 668 F.3d at 321.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief.  28 U.S.C. § 2253(c)(1).  A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.  Applying this standard, the Court concludes that no reasonable jurist would disagree that Petitioner's petition for habeas relief is untimely, that Petitioner's claims of ineffective assistance of counsel are meritless or not cognizable herein, and that Petitioner's remaining claims are procedurally defaulted.  Accordingly, a COA will not issue.

## V.    CONCLUSION

For the reasons set forth above, Petitioner has failed to demonstrate an entitlement to federal habeas relief.  Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this

action will be **DISMISSED WITH PREJUDICE**.   A certificate of appealability from this decision will be **DENIED**.

        **AN APPROPRIATE ORDER WILL ENTER.**

s/Clifton L. Corker
United States District Judge